ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona
MARK J. WENKER
Assistant United States Attorney
Arizona State Bar Number 018187
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Mark.Wenker@usdoj.gov

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

United States of America,

Plaintiff,

v.

1. Real Property Located at
   157 W 57th St., Unit 42C,
   New York, NY 10019 titled in the
   name of Joseph Menaged as Trustee
   of The Joseph Menaged Revocable
   Trust Agreement;

2. Real Property located at
   3315 Collins Ave., Unit 9C/9D
   Miami Beach, FL 33140 titled in the
   name of Joseph Menaged, as Trustee
   of the Joseph Menaged Revocable
   Trust Under Agreement dated
   12/18/14,

Defendants.

**VERIFIED COMPLAINT FOR
FORFEITURE *IN REM***

Plaintiff United States of America brings this complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions:

## BASIS FOR FORFEITURE

1.      This is a civil action *in rem*, brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(C) for the forfeiture of property, real or personal, which constitutes or is

1  derived from proceeds traceable to a violation of a specified unlawful activity, including

2  but not limited to, wire fraud, 18 U.S.C. § 1343.

3      2.     This is a civil action *in rem*, brought to enforce the provisions of 18

4  U.S.C. § 981(a)(1)(C) for the forfeiture of property, real or personal, which constitutes

5  or is derived from proceeds traceable to a violation of, among other things, bank fraud,

6  18 U.S.C. § 1344.

7      3.     This is a civil action *in rem*, brought to enforce the provisions of 18 U.S.C.

8  § 981(a)(1)(A) for the forfeiture of property, real or personal, involved in a transaction

9  or attempted transaction in violation of 18 U.S.C. §§ 1956 and 1957.

10                  **JURISDICTION AND VENUE**

11      4.     This Court has jurisdiction because the United States commenced this

12  action and because it seeks forfeiture. 28 U.S.C. §§ 1345, 1355(a).  Venue is proper in

13  this District because acts or omissions giving rise to forfeiture occurred in this District.

14  28 U.S.C. § 1355(b)(1)(A).

15                  **DEFENDANT IN REM**

16      5.     Defendant 1 is real property at 157 W 57th St., Unit 42C, New York, New

17  York 10019, and more specifically described as follows:

18  The Condominium Unit (the "Unit") known as Unit No. 42C in the building (the
19  "Building") known as TBD and by the street number 157 West 57th Street,
20  Borough of Manhattan, City of New York, County of New York, State of New
    York, said Unit being designated and described as Unit No. 42C in a certain
21  declaration dated TBD, made by Sponsor pursuant to Article 9-B of the Real
    Property Law of the State of New York (the "Condominium Act"), establishing a
22  plan for condominium ownership of the Building and the land (the "Land") upon
23  which the Building is situate (which Land is more particularly described herein),
    which declaration was recorded in the New York County Office of the Register of
24  the City of New York on TBD in CRFN TBD (which declaration and
    amendments thereto, if any, are hereafter collectively referred to as the
25  "Declaration"). This Unit is also designated as Tax Lot TBD in Block 1010 of the
26  Borough of Manhattan on the Tax Map of the Real Property Assessment
    Department of the City of New York and on the Floor Plans of the Building, filed
27  with the Real Property Assessment Department of the City of New York as

28

Condominium Plan No. TBD, and also filed in the Register's Office on TBD in CRFN TBD.

TOGETHER with an undivided TBD% interest in the Common Elements.

As to Old Lot 7

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street, distant 144 feet east from the corner formed by the intersection of the northerly side of 57th Street and easterly side of Seventh Avenue;

THENCE northerly parallel with the easterly side of Seventh Avenue and partly through a party wall, 100 feet 5 inches to the center of the block;

THENCE easterly along said center line of the block parallel with 57th Street, 18 feet;
THENCE southerly again parallel with Seventh Avenue and partly through a party wall, 100 feet 5 inches to the northerly side of 57th Street;

THENCE westerly along the same, 18 feet to the point or place of BEGINNING.

As to Old Lot 10

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street, distant 224 feet 6 inches easterly from the corner formed by the intersection of the northerly side of 57th Street with the easterly side of 7th Avenue;

RUNNING THENCE northerly parallel with 7th Avenue and part of the distance through a party wall, 100 feet 5 inches to the center line of the block;

THENCE easterly along the center line of the block and parallel with 57th Street, 21 feet 6 inches;

THENCE southerly again parallel with 7th Avenue and part of the way through another party wall, 100 feet 5 inches to the northerly side of 57th Street;

THENCE westerly along the northerly side of 57th Street, 21 feet 6 inches to the point or place of BEGINNING.

As to Old Lot 11

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of Fifty-Seventh Street, distant two hundred and forty-six (246) feet easterly from the corner formed by the intersection of the northerly side of Fifty-Seventh Street with the easterly side of Seventh Avenue;

RUNNING THENCE northwardly parallel with Seventh Avenue and part of the distance through a party wall, one hundred (100) feet and five (5) inches to the centre line of the block;

THENCE eastwardly along said centre line of the block and parallel with Fifty-Seventh Street, twenty (20) feet;
THENCE southwardly again parallel with Seventh Avenue and part of the distance through another party wall, one hundred (100) feet and five (5) inches to the northerly side of Fifty-Seventh Street; and

THENCE westwardly along the northerly side of Fifty-Seventh Street, twenty (20) feet to the point or place of BEGINNING.

As to Air Rights above Lot 55

ALL that certain volume of air, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, which lies above a horizontal plane drawn at an elevation of 165.78 feet above the datum used by the Topographical Bureau of the City of New York, Borough of Manhattan (which is 2.75 feet above the United States Coast and Geodetic Survey mean sea level datum, Sandy Hook, New Jersey) bounded and described as follows:

BEGINNING at a point on the southerly side of 58th Street, distant 203 feet easterly from the southeasterly corner of 58th Street and 7th Avenue;

RUNNING THENCE southerly parallel with 7th Avenue and part of the distance through a party wall 100 feet 5 inches to the center line of the block;

THENCE easterly along the said center line of the block 42 feet;

THENCE northerly parallel with 7th Avenue 100 feet 5 inches to the southerly side of 58th Street;

THENCE westerly along the southerly side of 58th Street, 42 feet to the point or place of BEGINNING.

As to Old Lot 111

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street, 266 feet easterly from the corner formed by the intersection of the easterly side of 7th Avenue and the northerly side of 57th Street;

RUNNING THENCE northerly parallel with 7th Avenue and part of the way through a party wall, 100 feet 5 inches to the center line of the block;

THENCE easterly along the center line of the block, 37 feet;
THENCE southerly parallel with 7th Avenue and part of the way through a party wall, 100 feet 5 inches to the northerly side of 57th Street;

THENCE westerly along the northerly side of 57th Street, 37 feet to the point or place of BEGINNING.

As to Old Lot 57

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of 58th Street, distant 125 feet easterly from the southeasterly corner of the said 58th Street and Seventh Avenue;

RUNNING THENCE southerly parallel with Seventh Avenue, 100 feet 5 inches to the center line of the block;

THENCE easterly along said center line of the block and parallel with said 58th Street, 78 feet;

THENCE northerly again parallel with Seventh Avenue and part of the way through another party wall, 100 feet 5 inches to the southerly side of said 58th Street;

THENCE westerly along said southerly side of 58th Street, 78 feet to the point or place of BEGINNING.

As to Old Lot 8

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City, and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of 57th Street, distant 162 feet easterly from the corner formed by the intersection of the northerly side of 57th Street with the easterly side of Seventh Avenue;

RUNNING THENCE northerly parallel with Seventh Avenue and part of the distance through a party wall, 100 feet 5 inches to the center line of the block;

THENCE easterly parallel with 57th Street, 62 feet 6 inches;

THENCE southerly parallel with Seventh Avenue and part of the distance through a party wall, 100 feet 5 inches to the northerly side of 57th Street;

THENCE westerly along the northerly side of 57th Street, 62 feet 6 inches to the point or place of BEGINNING.

Said premises also known as 157 West 57th Street, Unit 42C, New York, NY.

Tax I.D. 1010-1626

6.      Defendant 2 is real property at 3315 Collins Ave., Unit 9C/9D, Miami Beach, FL 33140, and more specifically described as:

Deed Book/Page No: 30040/4677

The following described land situate and being in Miami-Dade County, Florida (the "Property"):

Condominium Parcel No. 9-C in 3315 TOWER, A CONDOMINIUM, according to the Declaration thereof, recorded September 1, 2015 in Official Records Book 29759, Page 4481, of the Public Records of Miami-Dade County, Florida, as

amended and/or supplemented from time to time, together with an undivided interest in the common elements appurtenant thereto.

Deed Book/Page No: 30040/4675

The following described land situate and being in Miami-Dade County, Florida (the "Property"):

Condominium Parcel No. 9-D in 3315 TOWER, A CONDOMINIUM, according to the Declaration thereof, recorded September 1, 2015 in Official Records Book 29759, Page 4481, of the Public Records of Miami-Dade County, Florida, as amended and/or supplemented from time to time, together with an undivided interest in the common elements appurtenant thereto.

Tax ID : 02-3226-055-0260

## FACTS

**REAL ESTATE FRAUD SCHEME**

7.     Yomtov Scott Menaged ("Scott Menaged") was a local real estate investor who also starred on the television show "Property Wars."  As a real estate investor, Scott Menaged would purchase foreclosed property at trustee's sales and quickly rehabilitate and sell the properties for a profit. Scott Menaged operated through his companies, including Arizona Home Foreclosures, LLC ("AHF"), as part of his real estate investor business.

8.      Generally, a real estate investor will obtain short-term financing from a private lender, sometimes referred to as a "hard money" lender.  Hard money lenders usually lend money in a first deed position with the property acting as collateral, with a term of less than 12 months, and an annualized interest rate of 18%. DENSCO Investment Corp. ("DENSCO") was a hard moneylender utilized by Scott Menaged and AHF.

9.     Typically, hard money lenders utilize title companies to act as an intermediary between the lender, buyer, and seller.  Title companies oversee the real estate transaction and ensure that the financing is used for the designated purpose and that title to the property is free and clear of encumbrances prior to the close of escrow. Title companies hold money in an escrow account on behalf of the lender, buyer, and seller until such time that it can be disbursed for the purchase or sale of a specific property.  Scott Menaged, AHF, and DENSCO did not utilize the services of a title company.  DENSCO would provide financing in the form of high interest loans directly to Scott Menaged and AHF for the purchase of properties identified by Scott Menaged that were to be auctioned off at trustee sales.  The loans were funded by electronic wire transfers directly from the DENSCO bank account to Scott Menaged and AHF's bank accounts.

10.    Scott Menaged typically identified properties to purchase and listed the properties and the sales prices in an email that was sent to DENSCO.  In turn, DENSCO required that Scott Menaged and AHF email a copy of the bank cashier's checks that was intended to be used in the real estate purchase and a trustee sales receipt for a successful real estate purchase.  Scott Menaged and others at AHF would provide DENSCO a fabricated sale receipt indicating that Scott Menaged and AHF were successful in their bid to purchase a specific property.  In fact, Scott Menaged and AHF did not actually make the property purchases as represented to DENSCO.  In many situations, after Scott Menaged had requested a cashier's check be drawn on his bank account, he simply redeposited the cashier's check back into his bank account or other accounts he controlled rather than utilize the cashier's check for a real property purchase.

11.    DENSCO would record a mortgage against the allegedly purchased property in order to secure its interest in that property.  This action did not ultimately secure title because in most instances, the purchase of the property never took place and the DENSCO mortgage only temporarily clouded the title with an invalid lien.

12.     Upon receipt of funds from DENSCO for the intended purchase of property, Scott Menaged and AHF would instead divert the funds to various accounts in Scott Menaged and others' names.  Thereafter, Scott Menaged would make partial payments to DENSCO on loans with funds traced to prior DENSCO loan transactions with Scott Menaged and AHF.  The funds diverted by Scott Menaged ultimately were used to pay personal expenses including but not limited to, the following: car payments; trips to Las Vegas; gambling; personal mortgages; and payments to Scott Menaged's family members, including Joseph Menaged.

13.     Between January 2013 and June 2016, Scott Menaged obtained approximately 2,712 loans from DENSCO totaling approximately $734,484,440.67.  Of the 2,712 loans made by DENSCO, less than 4% of them involved actual property purchases, the remaining approximately 96% of the loans represented phantom real estate purchases made by Scott Menaged and AHF.

14.     The number of loans and the aggregate loan amount extended by DENSCO grew to such a large number because Scott Menaged used new loans to pay off old loans.  Furthermore, because the loans were fraudulent and Scott Menaged was paying interest on the fraudulent loans at a rate of 18%, the total number and frequency of subsequent loans increased significantly over time.  As a result of the phantom real estate fraud scheme, DENSCO was defrauded of approximately $47,156,641.92.

15.     Scott Menaged transferred some of the funds he defrauded from DENSCO to his father, Joseph Menaged.  For instance, between February 13, 2015 through October 1, 2015, DENSCO wired a total of $133,087,329.85 from its' 1st Bank account ending in #5264 to AHF's JP Morgan Chase account ending in #1151, and AHF then wired a total of $709,405.40 to Joseph Menaged's Bank United account ending in #0927.  The wire transfers into account #0927 are the proceeds of the real estate scheme, or are traceable to such proceeds, and are property involved in the money laundering offenses, or traceable to such property.

16.     The chart below illustrates eight examples of electronic wires that originated with DENSCO's 1st Bank account ending in #5264, of which a portion ultimately ended up in Joseph Menaged's Bank United account ending in #0927.

| Wire In Date | DENSCO acct #5264 Wire In to AHF acct #1151 | Wire out Date | AHF acct #1151 Wire Out to Joseph Scott Menaged acct #0927 |
|---|---|---|---|
| February 13, 2015 | $1,741,900.00 | February 17, 2015 | $51,156.89 |
| February 24, 2015 | $1,320,100.00 | February 24, 2015 | $10,000.00 |
| March 3, 2015 | $1,206,600.00 | March 3, 2015 | $56,844.89 |
| March 16, 2015 | $1,312,700.00 | March 16, 2015 | $34,504.95 |
| April 1, 2015 | $2,048,600.00 | April 1, 2015 | $56,844.89 |
| May 1, 2015 | $1,080,800.00 | May 1, 2015 | $56,844.89 |
| May 15, 2015 | $1,670,800.00 | May 15,2015 | $36,265.67 |
| June 1, 2015 | $1,428,400.00 | June 1, 2015 | $56,844.89 |

17.     By way of example, the fraudulent transactions described above as they relate to a specific property, 7263 E. Manzanita Dr. Scottsdale, AZ 85258, are detailed below:

a)     A notice of a trustee's sale scheduled for April 20, 2015, was recorded with the Maricopa County Recorder's Office on or about January 9, 2015.  This document served as notice that the above listed property would be auctioned.

b)     On or about March 12, 2015, a cancellation of the trustee's notice of sale was recorded.

c)     On or about May 5, 2015, Scott Menaged used his email account to email DENSCO a listing of six properties:

| Property | Total Amount | Recorded Doc |
|----------|-------------|--------------|
| 4624 E. Kathleen Rd. | $ 262,700 | 20150047537 |
| 7263 E. Manzanita Dr. | 271,700 | 20150019188 |
| 8362 W. Shaw Butte Dr. | 234,100 | 20150032836 |
| 20892 S. Claudis Rd. | 257,800 | 20150022008 |
| 2938 E. Teakwood Pl. | 284,100 | 20150012495 |
| 4031 W. Lydia Ln. | 222,300 | 20150012815 |
| **Wire Total** | **$   1,532,700** | |

     d)    On or about May 5, 2015, a third party trustee sale receipt was provided to DENSCO by AHF purporting that the Manzanita property was purchased for $271,700.00 on behalf of AHF.

     e)    On or about May 5, 2015, a wire transfer in the amount of $1,532,700.00 was sent from DENSCO's 1st Bank account ending in #5264 to AHF's JP Morgan Chase account ending in #1511.

     f)    On or about May 5, 2015, DENSCO sent an email with attachments to Scott Menaged that contained a deed of trust, note secured by deed of trust, and residential mortgage for 7263 E. Manzanita.

     g)    On or about May 6, 2015, DENSCO recorded title with the Maricopa County Recorder's Office to protect its collateral interest despite the fact that the purchase had not actually been made.

     h)    On or about May 15, 2015, a wire transfer in the amount of $36,265.67 was sent from AHF's JP Morgan Chase account ending in #1511 to Joseph  Menaged's account.

18.    This May 15, 2015, wire transfer, and other transfers, from Scott Menaged to Joseph Menaged involved fraud proceeds and property involved in money laundering offenses.

**BANK AND CREDIT FRAUD SCHEME**

19.    In addition to real estate investing, Scott Menaged and others operated retail furniture stores in the Phoenix metropolitan area.  The furniture stores operated under the names: Furniture King, Furniture and Electronic King, Scott's Fine Furniture, American Furniture and Furniture Pluss.  As a service to their customers, Scott Menaged and others offered lines of credit that could be immediately established for in-store purchases.  The lines of credit offered by the retail stores are referred to as a merchant account and are serviced by a regional or national lender.  Scott Menaged and others utilized merchant lending services through Wells Fargo Bank and Synchrony Financial.

20.    On or about September 8, 2015, Scott Menaged signed a Wells Fargo National Bank General Dealer Agreement Application Preferred Customer Account Credit Card Program form on behalf of Furniture King.  Upon approval of a customer's application by the bank, the customer is able to make in-store furniture purchases against the line of credit.

21.    On or about December 15, 2015, Veronica Castro signed a Synchrony Financial Merchant Application on behalf of Furniture and Electronic King.  Upon approval, which can happen almost instantaneously, customers are able to make in-store furniture purchases against the line of credit.

22.    On or about December 21, 2016, Alberto Pena, ostensibly acting on behalf of Scott Menaged, signed a Synchrony Financial Merchant Application on behalf of American Furniture.  Upon approval, customers are able to make in-store furniture purchases against the line of credit.

23.    On or about December 23, 2016, Metro Inspections, on behalf of Synchrony Financial, conducted a merchant site inspection of American Furniture located at 4247 W. Thomas Rd. Phoenix, AZ 85019.  During the site inspection, Metro Inspections met with Pena, who provided his Arizona driver license as proof of identification.  The signature on the license provided and the signature on the original

Synchrony Financial merchant application signed on or about December 21, 2016, did not match.

24.    On or about December 22, 2016, Synchrony Financial received two telephone calls from an individual identifying himself as "Pena."   The calls were in reference to a merchant account application that the caller stated had been faxed to Synchrony Financial. The caller's voice was identified as Scott Menaged. The call was made from the American Furniture telephone number 602-442-6795.

25.    On or about January 4, 2017, Synchrony Financial received two telephone calls from an individual identifying himself as "Scott."   The calls were in reference to obtaining a credit line increase on behalf of a customer. The call was made from the American Furniture telephone number 602-442-6795.

26.    On or about January 11, 2017, Synchrony Financial received three telephone calls from an individual identifying himself as "Pena."   The calls were in reference to funding/deposits not received to the caller's merchant account.   The caller's voice was identified as Scott Menaged. The call was made from the American Furniture telephone number 602-442-6795.

27.    On or about January 12, 2017, Troy Flippo signed a Synchrony Financial Merchant Application on behalf of Furniture Pluss.    Upon approval, customers are able to make in-store furniture purchases against the line of credit.

28.    On or about January 13, 2017, Metro Inspections, on behalf of Synchrony Financial, conducted a merchant site inspection of Furniture Pluss located at 4319 W. Glendale, Ave. Phoenix, AZ 85301.  During the site inspection, Metro Inspections met with Flippo, who provided his Arizona driver license as proof of identification.  The signature on the license provided and the signature on the original Synchrony Financial merchant application signed on or about January 12, 2017, appeared to match.

29.    On or about January 17, 2017, Synchrony Financial received two telephone calls from an individual calling on behalf of Furniture Pluss.  The calls were in reference to a new merchant account application.  The caller's voice was identified as

Scott Menaged.  The call was made from the American Furniture telephone number 602-442-6795.

30.     On or about January 18, 2017, Synchrony Financial received a call from an individual calling on behalf of Furniture Pluss.  The call was in reference to a new merchant account application that had been submitted.  The caller's voice was identified as Scott Menaged.  The call was made from the American Furniture telephone number 602-442-6795.

31.     On or about January 19, 2017, Synchrony Financial received three telephone calls from an individual identifying himself as "Pena."  The calls were in reference to funding/deposits not received to the caller's merchant account.  The caller's voice was identified as Scott Menaged. The call was made from the American Furniture telephone number 602-442-6795.

32.     On or about January 27, 2017, Synchrony Financial received a call from an individual identifying himself as "Troy" from Furniture Pluss.  The call was in reference to a customer's pending credit application.  The caller's voice was identified as Scott Menaged. The call was made from the American Furniture telephone number 602-442-6795.

33.     On or about January 28, 2017, Synchrony Financial received a call from an individual identifying himself as "Troy" from Furniture Pluss.  The call was in reference to a customer's pending credit application.  The caller's voice was identified as Scott Menaged. The call was made from the American Furniture telephone number 602-442-6795.

34.     From on or about September 8, 2015 through February 2, 2017, approximately 178 credit accounts were established at the following stores operated by Scott Menaged and others: Furniture King, Furniture and Electronic King, Scott's Fine Furniture, American Furniture, and Furniture Pluss.  Almost every credit account was established in the names, and with the use of personal identification information, of recently deceased individuals.  Many of the deceased had died merely days prior to

credit being established in their names and in at least one case, credit was established the day of death.  Many of the account applications associated with these credit accounts were hand prepared with similar handwriting.  In addition, the identification documents required with the applications had been altered with many of the identification cards bearing the same photos.

35.     The total amount charged on the fraudulent lines of credit associated with the identified 178 accounts is approximately $2,112,405.97.  The dealer agreements established between Scott Menaged, Castro, Pena, and Flippo with Wells Fargo Bank and Synchrony Financial have been terminated at a financial loss to the banks.

36.     Examples of fraudulent Furniture King credit line transactions with Wells Fargo Bank as described above include:

a)     On or about December 18, 2015, a $15,000.00 credit account was established through Furniture King in the name of Cherie A. Holm.  The hand-written account application and signatures were similar to handwriting and signatures on other applications established around the same time period.  The Arizona identification card used for the application was not a valid identification card.  Approximately $14,981.00 in charges were incurred.  Cherie A. Holm died on or about December 13, 2015, prior to credit being established in her name at Furniture King.

b)     On or about January 2, 2016, a $10,000.00 credit account was established through Furniture King in the name of Ernest R. Maestas.  The hand written account application and signatures were similar to handwriting and signatures on other applications established around the same time period.  The Arizona identification card used for the application is a valid identification but is issued in the name of a person other than Ernest R. Maestas.    Approximately $10.000.00 in charges were incurred.  Earnest R. Maestas died on or about December 21, 2015, prior to credit being established in his name at Furniture King.

c)      On or about December 16, 2015, a $16,500.00 credit account was established through Furniture King in the name of George Berger. Approximately $16,500.00 in charges were incurred.  George Berger died on or about December 7, 2015, prior to credit being established in his name at Furniture King.

d)      On or about December 19, 2015, a $14,800.00 credit account was established through Furniture King in the name of Jimmie Horton. Approximately $14,800.00 in charges were incurred.  Jimmie Horton died on or about December 15, 2015, prior to credit being established in his name at Furniture King.

37.    On or about February 2, 2016, Scott Menaged entered the JP Morgan Chase bank at Shea Blvd. in Scottsdale and purchased the eight sequential money orders listed below.   The money orders were purchased with $3,000.00 cash that Scott Menaged brought into the bank.  The transaction was captured on JP Morgan Chase digital video surveillance at the branch.

| Name | Check # | Date | Amount |
|------|---------|------|--------|
| Cherie A. Holm | 9018107750 | 02/02/2016 | $500.00 |
| Ernest R. Maestas | 9018107751 | 02/02/2016 | $500.00 |
| James Hinkley | 9018107752 | 02/02/2016 | $500.00 |
| George Berger | 9018107753 | 02/02/2016 | $500.00 |
| Jimmie Horton | 9018107754 | 02/02/2016 | $500.00 |
| Cherie A Holm | 9018107755 | 02/02/2016 | $200.00 |
| George Berger | 9018107756 | 02/02/2016 | $200.00 |
| Jimmie Horton | 9018107757 | 02/02/2016 | $100.00 |

Each of the purchased money orders were mailed to Wells Fargo Bank as payment on the recently established fraudulent lines of credit.

38.     Examples of fraudulent American Furniture credit line transactions with Synchrony Financial as described above include:

a)     On or about January 4, 2017, a $25,000.00 credit account was established through American Furniture's merchant account in the name of Faith Kopp.  The credit application was submitted online.  Approximately $25,000.00 in charges were incurred. That same day, Synchrony Financial received a call from a customer who identified herself as "Faith Kopp" from phone number (602) 690-9848, requesting a line of credit increase from $6,500.00 to $25,000.00.   The telephone number used to make the call belonged to Hope Kopp, Faith Kopp's daughter.   On or about January 18, 2017, Synchrony Financial contacted Faith Kopp at phone number (480) 216-9507.  Upon getting Faith Kopp on the phone, Synchrony Financial asked if she had made a charge of $25,000.00 with American Furniture.  Faith Kopp stated that she had not made the charge but stated that her daughter had gone to the American Furniture store but did not make a purchase.   Upon the transfer of the call to a fraud representative, the line was disconnected.

b)     On or about January 7, 2017, a $16,500.00 credit account was established through American Furniture's merchant account in the name of Tommy E. Lockridge.   The application was submitted online.   Approximately $15,860.00 in charges were incurred. Tommy E. Lockridge died on or about January 2, 2017, prior to credit being established in his name at American Furniture.

c)   On or about a January 11, 2017, a $4,000.00 check made payable to Hope Kopp was deposited into Kopp's Wells Fargo checking account ending in #5521 at the Wells Fargo branch located at 6965 N. Hayden Rd. Scottsdale, AZ. The check was issued by payor American Furniture, was signed by Scott Menaged, and endorsed for deposit by Kopp.

d)   On or about a January 14, 2017, a $4,000.00 cashier's check made payable to Hope Kopp was deposited into Kopp's Wells Fargo checking account ending in #5521 at the Wells Fargo branch located at 3540 W Glendale Ave in Phoenix, AZ 85051.  The cashier's check was issued from US Bank and endorsed for deposit by Kopp.   Surveillance video shows that the cashier's check was deposited by Pena.

e)   On or about a January 15, 2017, a $17,600.00 credit account was established in the name of Kenneth A. Jacuzzi.  Approximately $16,789.60 in charges were incurred. Kenneth A. Jacuzzi died on or about January 4, 2017, prior to credit being established in his name at American Furniture.

39.    Examples of fraudulent Furniture Pluss credit line transactions with Synchrony Financial as described above include:

a)    On or about January 21, 2017, a $18,200.00 credit account was established through Furniture Pluss's merchant account in the name of Laura E. Boyle.   The application was submitted online.  Approximately $16,840.00 in charges were incurred.  Laura E. Boyle died on or about January 9, 2017, prior to credit being established in her name at Furniture Pluss.

b) On or about January 21, 2017, a $17,200.00 credit account was established through Furniture Pluss in the name of Gloria Lazok.  Approximately $16,000.00 in charges were incurred. Gloria Lazok died on or about January 16, 2017, prior to credit being established in her name at Furniture Pluss.

c)    On or about January 21, 2017, a $17,600.00 credit account was established through Furniture Pluss in the name of Fredrick Schnecker. Approximately $15,900.00 in charges were incurred. Fredrick Schnecker died on or about January 12, 2017, prior to credit being established in his name at Furniture Pluss.

40.    On or about January 23, 2017, Synchrony Financial wired $47,107.21 to Furniture Pluss's BBVA Compass account ending in #9310.  Thereinafter, Flippo wired

$46,000.00 from his BBVA Compass account ending in #9310 to American Furniture's US Bank ending in #4488. The wire transfer into account #4488 is the proceeds of the fraud offenses described in this affidavit, is traceable to such proceeds, and is property involved in the money laundering offenses described in this affidavit, or traceable to such property.

**SCOTT MENAGED'S CRIMINAL CONVICTION**

41.    Because of these and other similar fraudulent acts, on May 16, 2017, Scott Menaged and others were indicted on 24 counts of conspiracy, wire fraud, and aggravated identity theft, *United States v. Yomtov Scott Menaged, et al.*, CR 17-00680-PHX-GMS (MHB), United States District Court, District of Arizona.

42.    In the course of the criminal investigation and prosecution, the government obtained a seizure warrant, seized, and forfeited the $709,405.40 that Scott Menaged wire transferred to Joseph Menaged's Bank United account ending in #0927 as it was the proceeds of, or traceable to the proceeds of, Scott's fraud and was property involved in money laundering.

43.    On October 17, 2017, Scott Menaged pled guilty to counts 1 and 10 of the indictment, conspiracy to commit bank fraud and aggravated identity theft, and to a one count information charging money laundering conspiracy.

44.    Among other things, Scott Menaged admitted in his plea agreement that:

    a.   Between January 2013 and June 2016, he obtained approximately 2,712 loans from DENSCO totaling $734,484,440.67. Of these loans, only 96 involved actual property transactions, the remaining 2,616 represented phantom real estate purchases.

    b.   After embezzling the funds, he used the money for personal expenses and for large transfers of funds to family members.

c.   He utilized new loans from DENSCO to pay back outstanding DENSCO loans in order to conceal the embezzlement.  He defrauded DENSCO out of at least $34,000,000.

45.   On December 19, 2017, Scott Menaged was sentenced to a total of 204 months, 60 months for conspiracy to commit bank fraud and 180 months for money laundering conspiracy to run concurrently, and 24 months for aggravated identity theft to run consecutively.

46.   The Court also forfeited the $709,405.40 seized from Joseph Menaged's Bank United account and ordered more than $33,500,000 in restitution to the victims as follows: $31,446,001.79 to DENSCO, $1,145,392.81 to Wells Fargo Bank, and $967,013.16 to Synchrony Bank.

**SCOTT MENAGED TRANSFERS HIS FRAUD PROCEEDS TO HIS FATHER, JOSEPH MENAGED**

47.    Over the years, Scott Menaged transferred millions of dollars of his fraud proceeds to Joseph Menaged, his father.  From 2011 to 2017, Scott Menaged transferred to Joseph Menaged, via checks and electronic transfers, approximately $11,459,084, most of which were a portion of Scott Menaged's fraud proceeds.

48.   Joseph Menaged has claimed that he is an innocent owner of those fraud proceeds.  Joseph Menaged has claimed that on December 1, 2011, he loaned AHF $5,500,000 (the "$5.5M Promissory Note") and that the transfers from Scott Menaged to him are re-payments on the promissory note.

49.   In reality, Joseph Menaged never lent Scott Menaged $5,500,000 and Joseph Menaged and Scott Menaged intended to launder and conceal criminal proceeds via the $5.5M Promissory Note.

50.   The funds that Scott Menaged transferred to Joseph Menaged are property involved in a transaction or attempted transaction in violation of a money laundering

offense and are property, which constitutes or is derived from proceeds of a specified unlawful activity, including but not limited to wire fraud and bank fraud.

51.    As such, all such funds that Scott Menaged transferred to Joseph Menaged vested in the United States upon the commission of the offense giving rise to forfeiture. *See* 18 U.S.C. § 981(f).

52.    The United States' interest in the funds Scott Menaged transferred to Joseph Menaged is superior to any interest that Joseph Menaged has in those funds.

53.    Joseph Menaged used the fraud proceeds that Scott Menaged transferred to him to, among other things, acquire the defendant properties and pay the lines of credit and loans he obtained to acquire the defendant properties.

54.    By way of example, beginning in around February 2015 Joseph Menaged's Bank United account 0927 received reoccurring deposits in the amount of $56,844.89 from Scott Menaged, allegedly repayments on the $5.5M Promissory Note and Joseph Menaged quickly made payments to pay off his Bank United and Morgan Stanley loans that were used to purchase defendant properties.

55.    For instance, on November 2, 2105, Scott Menaged/AHF transferred $56,844.89 of fraud proceeds into Joseph Menaged's Bank United account 0927 and on the same day Joseph Menaged withdrew $5,747.25 and $11,760.26 to pay the mortgages on the two Miami Beach defendant properties and $9,003.16 to pay the mortgage on the NYC defendant property.

## JOSEPH MENAGED'S BANK FRAUD/PURCHASING DEFENDANT PROPERTIES WITH FRAUD PROCEEDS

### A.    West 57th Street, NYC

56.    On June 1, 2012, Joseph Menaged entered into a purchase agreement with Extell West 57th Street LLC for the purchase of Unit 42C at 157 West 57th Street in New York, New York. The terms of the agreement included a purchase price of $3,225,120, payable as follows: a) initial deposit of $651,024 due upon purchaser's

1   signing of the agreement; b) an additional deposit of $162,756 due on December 1, 2012

2   (six months from the date of the agreement); and c) the balance of $2,441,340 due upon

3   closing.

4        57.    The initial deposit of $651,024 was made via wire transfer from Joseph

5   Menaged's Bank of America account 0731 around May 31, 2012.

6        58.    On May 30, 2012, Joseph Menaged received an advance of $645,000 from

7   his Bank of America line of credit 6817-9004-148699 (the "BoA LOC 8699") to fund

8   the wire transfer for the initial deposit.

9        59.    The second deposit for $162,756 made on November 13, 2012, also was

10  made via wire transfer from Joseph Menaged's Bank of America account 0731.   An

11  advance of $163,000 received on November 13, 2012 was from the BoA LOC 8699

12  funded the transfer for the second deposit.

13       60.    Joseph Menaged was the only signer on a Bank of America account ending

14  0078 in the name of Short Term Finance LLC.  Scott Menaged, through his companies,

15  Easy Investments and Furniture King, transferred some of his fraud proceeds to the

16  Short Term Finance LLC Bank of America account ending in 0078, and Joseph

17  Menaged then transferred those fraud proceeds from that account to pay off his BoA

18  LOC 8699, which, as noted, was used to make the initial and second deposits of

19  $651,024 and $162,756 for the purchase the NYC property.

20  / / /

21  / / /

22

23

24

25

26

27

28

61.    By way of example, the following are transfers of Scott Menaged's fraud proceeds to Joseph Menaged's Short Term Finance LLC Bank of America account ending in 0078 and Joseph Menaged's subsequent transfers of those to pay down his BoA LOC 8699:

| Date | Deposit Amount into BOA-0078 from Easy Investments | Transfer Amount from BOA-0078 to BOA LOC-148699 |
|---|---|---|
| 06/05/2012 | $32,982.00 | $32,000.00 |
| 06/11/2012 | $40,980.83 | $40,000.00 |
| 06/18/2012 | $40,477.50 | |
| 06/19/2012 | | $32,500.00 |
| 07/02/2012 | $46,130.00 | |
| 07/03/2012 | | $40,000.00 |
| 07/11/2012 | $90,785.83 | $90,000.00 |
| 07/30/2012 | $16,215.00 | |
| 07/31/2012 | | $13,000.00 |
| 08/09/2012 | $65,977.00 | |
| 08/10/2012 | | $66,000.00 |
| 08/21/2012 | $42,318.00 | $28,000.00 |
| 08/28/2012 | $22,400.00 | |
| 08/29/2012 | | $22,000.00 |
| 09/05/2012 | $39,852.00 | |
| 09/06/2012 | | $39,850.00 |
| 09/14/2012 | $29,538.33 | |
| 09/16/2012 | | $29,500.00 |
| 10/02/2012 | $41,615.00 | |
| 10/03/2012 | | $41,600.00 |
| 10/22/2012 | $86,258.00 | $66,000.00 |
| 11/14/2012 | $86,258.00 | $60,000.00 |
| 12/07/2012 | $500,000.00 | $490,000.00 |

Deposit on 12/07/2012 came from Furniture King

62.    Also by way of example, the following are transfers of Scott Menaged's fraud proceeds to Joseph Menaged's  Bank of America account 0731, and Joseph Menaged's subsequent transfers of those to pay down his BoA LOC 8699:

| Date | Deposit Amount into BOA – 0731 from Easy Investments | Transfer Amount from BOA -0731 to BOA LOC - 148699 |
|------|------|------|
| 01/22/2013 | $134,325 | $132,000 |
| 02/04/2013 | $151,000 | $150,000 |
| 02/11/2013 | $81,000 | $80,000 |
| 02/25/2013 | $58,450 | $60,000 |
| 03/01/2013 | $52,724.25 | $52,000 |
| 03/05/2013 | $94,000 | $94,000 |
| 03/11/2013 | $129,935 | $120,000 |

63.   In March 2015, Joseph Menaged obtained a mortgage (loan number 1021443) from Bank United for approximately $2,278,584.  On the loan application Joseph Menaged indicated he had been self-employed for approximately three years as a real estate consultant/investor and had a monthly income of approximately $60,049, consisting of $57,000 from a notes receivable installment (the $5.5M Promissory Note) and $3,409 of employment income.  Per the settlement statement, Joseph Menaged made a $242,002.44 payment at closing.

64.   Joseph Menaged devised a scheme or artifice to defraud and obtained money or property from Bank United by means of false or fraudulent pretenses, representations, or promises, including but not limited to his stated monthly income, and he transmitted or caused to be transmitted by means of wire in interstate commerce writings for the purpose of executing such scheme.

65.   Joseph Menaged knowingly executed, or attempted to execute, a scheme or artifice to defraud a financial institution, Bank United, and obtained moneys, funds, credits or other property owned by, or under the custody or control of a financial institution, Bank United, by means of false or fraudulent pretenses, representations, or promises.

66.     Payments on the note (account number 1021443) were made from Bank United checking account 0927.  A payment amount of $9,003.16 has been withdrawn from this account on a monthly basis since May 2015.  As noted above, Scott Menaged transferred funds that he defrauded from DENSCO to Joseph Menaged's Bank United checking account 0927.  Joseph Menaged used those fraud proceeds to pay his loan for the NYC property.

**B.     3315 Collins Avenue, Units 9C and 9D, Miami Beach, FL**

67.     In early 2013, Joseph Menaged signed contracts to purchase two condominiums in Miami Beach, Florida, 3315 Collins Avenue, Units 9C and 9D.  After purchasing them, Joseph Menaged combined the two units into a single condominium unit.

**1.     Unit 9D**

68.     On March 22, 2013, Joseph Menaged entered into a purchase agreement with Tower 3315, LLC for the purchase of Unit 9D at 3315 Collins Avenue in Miami Beach, Florida.  The terms of the agreement included a purchase price of $2,600,000, payable as follows: a) application of reservation deposit of $260,000 due upon buyer's execution of the agreement; b) an initial deposit of $260,000 due upon buyer's execution of the agreement; c) an additional deposit of $260,000 due no later than 5 days following notice of the pouring of the ground floor slab; and d) the balance of $1,820,000 due at closing.

69.     The reservation deposit was made with check number 120 from Joseph Menaged's BoA LOC dated March 12, 2013, and payable to Chicago Title Insurance.  As noted, Joseph Menaged used Scott Menaged's fraud proceeds to pay down his BoA LOC.

70.     On March 22, 2013, Joseph Menaged purchased JPM Chase Cashier's check number 1175211758 payable to Chicago Title in the amount of $260,000 with funds drawn from his JPMC account 158758950.  This was funded by an advance from JPMC LOC V48389007 on March 19, 2013 in the amount of $485,000.

71.     On June 24, 2013, Joseph Menaged purchased JPM Chase cashier's check # 1175212641in the amount of $260,000.  Funds to purchase the cashier's check came from two withdrawals: one for $140,000 on June 24, 2013 from Joseph Menaged's JPMC account 158758950, and another for $120,000 on June 24, 2013 from Joseph Menaged's JPMC account 2939677761.

72.     In September 2015, Joseph Menaged obtained a mortgage (loan number 1508005417) from Bank United for $1,300,000.  On the application, Joseph Menaged indicated that he was self-employed with Arizona Home Foreclosures for eight years, his monthly income totaled approximately $102,429, which consists of the following sources: $56,845 listed as notes receivables (the $5.5M Promissory Note), $10,585 from dividends, and a distribution of $35,000.

73.     Joseph Menaged devised a scheme or artifice to defraud and obtained money or property from Bank United by means of false or fraudulent pretenses, representations, or promises, including but not limited to his stated monthly income, and he transmitted or caused to be transmitted by means of wire in interstate commerce writings for the purpose of executing such scheme.

74.     Joseph Menaged knowingly executed, or attempted to execute, a scheme or artifice to defraud a financial institution, Bank United, and obtained moneys, funds, credits or other property owned by, or under the custody or control of a financial institution, Bank United, by means of false or fraudulent pretenses, representations, or promises.

75.     Per the settlement statement, Joseph Menaged made a payment of $465,039.93 at closing. A wire transfer for $452,052.08 was made on September 18, 2015 and another wire transfer was made for $13,000 on September 21, 2015 payable to Staci J. Rutman PA from Joseph Menaged's Bank United account 0927.

76.     A payment in the amount of $5,747.25 has been withdrawn from Joseph Menaged's Bank United account 0927 on a monthly basis since November 2015.

77.     As noted above, Scott Menaged transferred funds that he defrauded from DENSCO to Joseph Menaged's Bank United checking account 0927.  Joseph Menaged used those fraud proceeds to pay his loan for his Miami Beach property.

## 2.     Unit 9C

78.     On April 11, 2013, Joseph Menaged entered into a purchase agreement with Tower 3315, LLC for the purchase of Unit 9C at 3315 Collins Avenue in Miami Beach, Florida. The terms of the agreement included a purchase price of $5,000,000, payable as follows: a) reservation deposit of $500,000 due upon buyer's execution of the agreement; b) additional deposit of $500,000 due no later than 5 days following notice of the pouring of the ground floor slab; and c) the balance of $4,000,000 due at closing.

79.     The reservation deposit of $500,000 was made April 8, 2013 via wire transfer payable to Chicago Title Insurance Company from Joseph Menaged's JPMorgan Chase account 158758950.  The payment to Chicago Title was funded by an advance of $400,000 on April 8, 2013 from his JPMC line of credit 903315644 and a $100,000 transfer from his JPMC savings account 2939677761 also made on April 8, 2013.  Payments on LOC 903315644 were made from Joseph Menaged's JPMC account 2939677761 which was funded by his JPMC account 158758950. The additional deposit for $500,000 made on June 24, 2013 was made with a cashier's check funded from Joseph Menaged's JPMC account 2939677761.

80.     In September 2015, Joseph Menaged obtained a mortgage (loan number 6007080036) from Morgan Stanley Private Bank for $3,000,000.   On the loan application, Joseph Menaged indicated that he was self-employed with a monthly income totaling almost $70,250, which consisted of the following three sources: $56,845 listed as other (the $5.5M Promissory Note), $4,044 listed as sole proprietor, and $9,360 listed as asset derived.

81.     Joseph Menaged devised a scheme or artifice to defraud and obtained money or property from Morgan Stanley by means of false or fraudulent pretenses, representations, or promises, including but not limited to his stated monthly income, and

he transmitted or caused to be transmitted by means of wire in interstate commerce writings for the purpose of executing such scheme.

82.     Joseph Menaged knowingly executed, or attempted to execute, a scheme or artifice to defraud a financial institution, Morgan Stanly, and obtained moneys, funds, credits or other property owned by, or under the custody or control of a financial institution, Bank United, by means of false or fraudulent pretenses, representations, or promises.

83.     Per the settlement statement, Joseph Menaged, made a $1,013,771.48 payment at closing.  Per Bank United records, Joseph Menaged sent approximately $1,023, 974 from his account 0927 to his attorney Staci Rutman.

84.     A payment in the amount of $11,760.26 has been withdrawn from Joseph Menaged's Bank United account 0927 on a monthly basis since November 2015.

85.     As noted above, Scott Menaged transferred funds that he defrauded from DENSCO to Joseph Menaged's Bank United checking account 0927.  Joseph Menaged used those fraud proceeds to pay his closing payment and his loan for the Miami Beach property.

## FIRST CLAIM FOR RELIEF

86.     The defendant property constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, including but not limited to, wire fraud, 18 U.S.C. § 1343, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

87.     The defendant property constitutes or is derived from proceeds traceable to a violation of, among other things, bank fraud, 18 U.S.C. § 1344, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## THIRD CLAIM FOR RELIEF

88.     The defendant property was involved in a transaction or attempted transaction in violation of a money laundering offense, 18 U.S.C. §§ 1956 and 1957, and

therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America prays that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendants be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court deems just and proper, together with the costs and disbursements of this action.

DATED this 11th day of May, 2018.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*S/ Mark J. Wenker*
MARK J. WENKER
Assistant United States Attorney

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the District of Arizona.

**The completed cover sheet must be printed directly to PDF and filed as an attachment to the Complaint or Notice of Removal.**

---

**Plaintiff(s): United States of America**

**Defendant(s): Real Property Located at 157 W 57th St., Unit 42C, New York, NY 10019 titled in the name of Joseph Menaged as Trustee of The Joseph Menaged Recovable Trust Agreement, et al**

County of Residence: Maricopa

County of Residence: Outside the State of Arizona

County Where Claim For Relief Arose: Maricopa

Plaintiff's Atty(s):

**Mark J Wenker , Assistant United States Attorney**
**United States Attorney's Office**
**40 N Central Ave., Ste 1800**
**Phoenix, Arizona  85004**
**602-514-7500**

Defendant's Atty(s):

---

II. Basis of Jurisdiction:          **1. U.S. Government Plaintiff**

III. Citizenship of Principal Parties
**(Diversity Cases Only)**

                    Plaintiff:- **N/A**
                    Defendant:- **N/A**

IV. Origin :          **1. Original Proceeding**

V. Nature of Suit:          **690 Other**

VI. Cause of Action:          **Forfeiture of property to the U.S. pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 981 (a)(1)(A).**

VII. Requested in Complaint

          Class Action: **No**
          Dollar Demand:
          Jury Demand: **No**

<u>VIII. This case</u> **is not related** to another case.

**Signature: <u>S/ Mark J. Wenker</u>**

**Date: <u>05/11/2018</u>**

**If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, save this form as a PDF and include it as an attachment to your case opening documents.**

Revised: 01/2014

## **VERIFICATION**

I, Special Agent Denise Lucero, hereby verify and declare under penalty of perjury that I, Denise Lucero, am a Special Agent with the Internal Revenue Service – Criminal Investigation Division, that I have read the foregoing Verified Complaint *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to us by other law enforcement officers, as well as our investigation of this case, together with others, as a Special Agent with the Internal Revenue Service – Criminal Investigation Division.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10th day of May, 2018.

Denise Lucero, Special Agent
Internal Revenue Service – Criminal
Investigation Division